UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROSEMARY SALEM,
LORIA RONIKE SALEM,
DEANDRE TERRILL TUNSTALL,
by and through his mother and legal
guardian, ROSEMARY SALEM, and
WILLIE JAMES WILLIAMS,
by and through his mother and legal
guardian, ROSEMARY SALEM,

       Plaintiffs,

vs.                                     Case No. 8:04-cv-297-T-24EAJ

CITY OF SARASOTA,
a Florida Municipal Corporation,
WILLIAM BALKWILL as SHERIFF of
SARASOTA COUNTY,
MICHAEL JOLLY, individually,
DERRICK GILBERT, individually, and
WILLIAM BLOOD, individually,

       Defendants.
_____/

# **O R D E R**

This cause comes before the Court for consideration of the following motions:

(1) Defendants', City of Sarasota,  Michael Jolly ("Jolly") and Derrick Gilbert

("Gilbert"), Motion for Final Summary Judgment (Doc. No. 66).  Plaintiffs filed an opposition

thereto (Doc. No. 100);

(2) Defendants', William Blood ("Blood") and Sarasota County Sheriff William F.

Balkwill ("Balkwill"), Motion for Summary Judgment (Doc. No. 72).  Plaintiffs filed an

opposition thereto (Doc. No. 101);

 (3) Plaintiffs' Motion for Partial Summary Judgment and Statement of Undisputed

Material Facts (Doc. No. 89).  Defendants City of Sarasota, Jolly and Gilbert filed an opposition

thereto (Doc. No. 95).  Defendants Blood and Balkwill also filed an opposition thereto (Doc. No.

99); and

     (4) Plaintiffs' Motion to Strike Debra Edwards and Zita Rekesius as Witnesses and to

Strike Their Affidavits (Doc. No. 93).  Defendants City of Sarasota, Jolly and Gilbert filed an

opposition thereto (Doc. No. 94). Defendants Blood and Balkwill also filed an opposition thereto

(Doc. No. 96).

### I.    Procedural Background

     On January 16, 2004, Plaintiffs filed an eleven count complaint against Defendants

seeking damages pursuant to 42 U.S.C. §§1983 and 1985(3), as well as supplemental state tort

claims in connection with an alleged illegal search which occurred on March 20, 2000.[1]  On

January 23, 2005, with leave of the Court, Plaintiffs filed their Amended Complaint asserting:

Conspiracy: Trespass to Land against Balkwill, as Sheriff of Sarasota County and City of

Sarasota (Count I); Violation of 42 U.S.C. § 1983: Conspiracy to Illegally Search against Blood,

Gilbert and Jolly (Count II); Invasion of Privacy against Balkwill, as Sheriff of Sarasota County

and City of Sarasota (Count IV); Trespass to Land against Balkwill, as Sheriff of Sarasota

County and City of Sarasota (Count V); Trespass to Chattel against City of Sarasota (Count VI);

Violation of 42 U.S.C. § 1983: Illegal Search against Blood, Gilbert and Jolly (Count VII);

Violation of U.S.C. § 1983: Excessive Use of Force against Jolly (Count VIII); Battery against

City of Sarasota (Count VIII [sic]); Violation of 42 U.S.C. § 1983: Failure to Intercede to

---

     [1]The Court notes the complaint was filed in the Fort Myers Division of the Middle
District of Florida and subsequently transferred to the Tampa Division of the Middle District of
Florida (Doc. No. 11).

Prevent Violation of the Plaintiffs' Constitutional Rights against Blood (Count IX); and

Negligence against City of Sarasota (Count X).  Balkwill is sued only in his official capacity as

Sheriff of Sarasota County.  All counts against Balkwill and the City of Sarasota are Florida tort

claims.

City of Sarasota, Jolly and Gilbert move for summary judgment on Counts I, II, IV - VIII

and X.  Blood and Balkwill move for summary judgment on Counts I, II, IV, V, VII and IX.

Plaintiffs seek partial summary judgment on Counts I, II and IV - VII.

## II.    Factual Background

At all times relevant to this case, Plaintiff Rosemary Salem ("Salem") rented a single-

family dwelling located at 3026 Gillespie Avenue, within the city limits of Sarasota, Florida (the

"Subject Property").  (Doc. No. 78, Salem Dep., p. 8).  Ms. Salem lived at the Subject Property

with her children, Loria Ronike Salem ("Lori"), Deandre Turnstall ("Deandre"), and Willie

Williams ("Willie")(collectively referred to as the "Salem Plaintiffs")[2](Doc. No. 78, Salem Dep.,

p. 37).  The Subject Property had a three-foot high chain link fence which ran the length of both

sides of the property and across the back of the Subject Property.  There was an opening in the

chain link fence in the front of the house where the driveway was located.  (Doc. No. 78, Salem

Dep., p. 34).  The chain link fence did not restrict visibility into the side yard or backyard.  The

side yard and backyard were visible from the street and adjacent properties.  (Doc. No. 78, Salem

Dep., pp. 34, 123 - 24; Doc. No. 81, Deandre Dep., p. 52).  The Salem Plaintiffs did not engage

in any activity in the backyard which would require privacy nor did they have any concern about

---

[2]Plaintiffs Deandre Tunstall and Willie Williams, both minors, bring this action by and
through their mother and legal guardian, Rosemary Salem.  (Doc. No. 59, ¶¶ 16 -17).

others observing their activities.  (Doc. No. 78, Salem Dep., p. 37; Doc. No. 71, Lori Dep., p. 97).  While living at the Subject Property, Plaintiffs did nothing to convey to passers-by that any outdoor area of the residence was considered private.  (Doc. No. 78, Salem Dep., p.129).

At all times relevant to this case, Blood was employed as a Deputy in the Sarasota County Sheriff's Office.  (Doc. No. 72, Exh. D, Blood Aff., ¶2).  On March 20, 2000, Blood was investigating an assault and battery complaint and as part of the investigation he interviewed Jesus Ramos, the victim, and obtained a written statement from him.  (Doc. No. 72, Exh. D., Blood Aff., ¶7 and Exhibit 1 thereto; Doc. No. 82, Blood Dep., p. 7).  Jesus Ramos identified Henry Salem as the perpetrator of the crime and identified his address as 3026 Gillespie Avenue in Sarasota.  (Doc. No. 72, Exh. D., Blood Aff., ¶7 and Exhibit 1 thereto; Doc. No. 72, Exh. E, Edwards Aff., ¶3; Doc. No. 82, Blood Dep., pp. 10 -11).  Previously, Keesha Ramos, who is the daughter of Jesus Ramos, had gone to the Subject Property and confronted Henry Salem who was at the residence.[3]  (Doc. No 71, Lori Dep., pp. 100 - 102; Doc. No. 78, Salem Dep., p. 154).  Henry Salem is Rosemary Salem's brother and uncle to Lori, Deandre and Willie.  (Doc. No. 78,  Salem Dep., pp. 150 - 51).

After interviewing Jesus Ramos, Blood went to 3026 Gillespie Avenue – the Subject Property – to look for Henry Salem, arriving there at 9:02 p.m.  (Doc. No. 82, Blood Dep., pp. 10 - 16 and Exh.1 thereto).  Before approaching the Subject Property, Blood requested backup from the Sarasota Police Department.  (Doc. No. 72, Exh. D, Blood Aff., ¶3).  Two City of Sarasota

---

[3]Apparently Henry Salem did not live at the Subject Property, however, he visited the Subject Property almost daily or every other day.  (Doc. No. 71, Lori Dep., p. 30; Doc. No. 81, Deandre Dep., p. 10).

police officers, Jolly and Gilbert, responded to the request.  (Doc. No. 80, Gilbert Dep., pp. 14 -

15).  Blood, Jolly and Gilbert briefly conferred before proceeding to the residence.  (Doc. No.

79; Jolly Dep., pp. 16 - 17; Doc. No. 80, Gilbert Dep., p. 14).

   The officers approached the Subject Property and either Blood or Gilbert knocked on the

front door.  (Doc. No. 80, Gilbert Dep., p. 36; Doc. No. 82, Blood Dep., p. 21).  At that time Lori

and Willie were the only Salem Plaintiffs present at the Subject Property.  (Doc. No. 78, Salem

Dep., pp. 37 - 38).  Lori observed an officer at the door but did not open it.  (Doc. No. 71, Lori

Dep., pp. 10 - 11).  Gilbert could hear a loud TV or music and tried to peak into the house

through a small crack in the blinds at the window.  (Doc. No. 80, Gilbert Dep., pp. 42-43 and 80

-81).  Jolly and Blood proceeded to the north side of the Subject Property and around the

northwest (front left) corner of the house.  (Doc. No. 79, Jolly Dep., pp. 25 - 26).  The Subject

Property had a window air conditioner on that side of the house.  (Doc. No. 79, Jolly Dep., pp.

26 27).  As he moved toward the backyard[4], Jolly encountered an un-restrained fifty to sixty-five

pound dog acting in an aggressive manner and barking.  (Doc. No. 79, Jolly Dep., pp. 28 - 29;

Doc. No. 82, Blood Dep., p. 27).  When the dog was within six feet of him, Jolly sprayed a short

burst of Cap-Stun[5] towards the dog to protect himself and Blood.  Jolly does not know if he

actually hit the dog with his Cap-Stun, but the dog ran to the back of the yard and continued to

bark.  (Doc. No. 79, Jolly Dep., pp. 29 - 32).  Blood and Jolly then walked back to the sidewalk

in front of the Subject Property.  (Doc. No. 79, Jolly Dep., p. 32; Doc. No. 82, Blood Dep., pp.

---

   [4]Jolly stated that he and Blood proceeded to the northeast corner of the house, or just east
of the northeast corner of the house.  (Doc. No. 79, Jolly Dep., p.28).

   [5]A proprietary spray device, apparently like a pepper spray, used by the officers of the
Sarasota Police Department.  (Doc. No. 73).

26 - 27).  Thereafter, Gilbert and Jolly got into their patrol car and left the Subject Property.
(Doc. No. 80, Gilbert Dep., p. 49; Doc. No. 82; Blood Dep., p. 29).  Blood left the area soon
thereafter, at 9:25 p.m.. (Doc. No. 72, Exh. D, Blood Aff., ¶6).

During the time the officers were at the Subject Property, Lori heard the air conditioner
make a clicking sound as it turned on but did not hear the sound of anything being sprayed into
the air conditioner.  (Doc. No. 71, Lori Dep., p. 54).  Neither Lori nor Willie observed any
officer spray anything.  (Doc. No. 71, Lori Dep., p. 95;  Doc. No. 75, Willie Dep., pp. 22 - 24).
Notwithstanding, Lori stated that she saw a cloud of white smoke approximately two feet high,
two feet wide, and ten feet long coming from the air conditioner.  (Doc. No. 71, Lori Dep., pp.
44 - 47, 51).  Lori claims the smoke continued to blow out of the air conditioner for about five
minutes after the officers left the Subject Property.  (Doc. No. 71, Lori Dep., p. 93).

Salem returned to the Subject Property approximately five minutes after the officers had
left.  (Doc. No. 71, Lori Dep., p. 66).  Lori advised her mother that the police had been there but
did not tell her about the cloud of white smoke until later.  Salem, with Deandre[6], then drove in
her car and flagged down a police officer to inquire what had happened.  When she returned
from flagging down the officer, Salem stated that she observed a cloud of smoke throughout the
entire house and at some point began to feel the effects of the purported Cap-Stun.  (Doc. No. 78,
Salem Dep., pp. 51 - 52 and 59-60).  Salem drove all of the Salem Plaintiffs to the hospital.
(Doc. No. 78, Salem Dep., pp. 46 and 57).  Lori did not tell her mother about the cloud of smoke
from the air-conditioner until after the Salem Plaintiffs had left the hospital.  (Doc. No. 78,
Salem Dep., pp. 57 - 58).

---

[6]Then age 10.

Plaintiffs complain that they suffered from coughing and burning eyes.  (Doc. No. 81, Deandre Dep., p. 31; Doc. No. 71, Lori Dep., p. 63; Doc. No. 78, Salem Dep., pp. 50 and 59). Plaintiffs also complain that Willie,  Deandre and Salem experienced nausea and vomiting. (Doc. No.81, Deandre Dep., p. 31; Doc. No. 78, Salem Dep., pp. 45, 51 and 59).

Despite Plaintiffs seeking medical attention at a hospital on March 20, 2000, there is no medical evidence that an encounter with pepper spray, specifically Cap-Stun, caused physical injury to any of the Plaintiffs.  The only medical evidence in this case comes from Dr. Carola Fleener ("Fleener"), Deandre's pediatrician.  Fleener first examined Deandre on November 30, 1999, four months prior to the incident in question.  At that time, Fleener diagnosed Deandre with asthma and allergies.  (Doc. No. 76, Fleener Dep., p. 15).  On April 13, 2000, almost a month after the incident in question, Fleener again examined Deandre for symptoms consistent with a prior diagnoses, i.e., asthma (Doc. No. 76, Fleener Dep., pp. 32 - 36).   At this time Fleener was advised about Deandre's alleged exposure to Cap-Stun.  (Doc. No. 76, Fleener Dep., p. 34).

Salem states that after she returned from the hospital, she observed "brown stuff" on peeled back duct tape on the broken window in her bedroom, which smelled and caused an irritation in her throat. (Doc. No. 78, Salem Dep., pp. 46 - 49).   She also claims there was "brown runny film" on the glass and mini blinds on the same bedroom window.  (Doc. No. 78, Salem Dep., pp. 46 - 48).  Kamran Loghman ("Loghman"), President and Chief Executive Officer of Zarc International, Inc. which manufactures Cap-Stun, analyzed a portion of the duct tape covering the broken window.  Loghman determined that while the duct tape contained traces of capsicum pepper, the chemicals on the duct tape could not have come from Cap-Stun.

(Doc. No. 73, Loghman Aff., Attachment 10 thereto).  Furthermore, Loghman states that the

amount of Cap-Stun present in Jolly's canister would not penetrate an air conditioner's filtration

system.  In addition, Loghman states Cap-Stun does not produce a white smoke such as

described by Lori or Salem.  (Doc. No. 73, Loghman Aff. and Reports thereto).  Lastly,

Loghman states that contact with airborne Cap-Stun produces severe coughing which  would

have precluded Plaintiffs from staying in the residence had there been Cap-Stun sprayed into the

residence.  (Doc. No. 73, Loghman Aff. and Reports thereto).

> **III.**     **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

the initial burden of showing the Court, by reference to materials on file, that there are no

genuine issues of material fact that should be decided at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by

"showing" or "pointing out" to the Court that there is an absence of evidence to support the non-

moving party's case.  <u>Id.</u> at 325.  Rule 56 permits the moving party to discharge its burden with

or without supporting affidavits and to move for summary judgment on the case as a whole or on

any claim.  <u>See</u> <u>id.</u>  When a moving party has discharged its burden, the non-moving party must

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to

interrogatories, and admissions on file," designate specific facts showing there is a genuine issue

for trial.  <u>Id.</u> at 324.

In determining whether the moving party has met its burden of establishing that there is

no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the

Court must draw inferences from the evidence in the light most favorable to the non-movant and

resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of

Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  The Eleventh Circuit has explained the

reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the
> universe of possible inferences from the facts established by weighing each
> against the abstract standard of reasonableness."  [citation omitted].  The
> opposing party's inferences need not be more probable than those inferences
> in favor of the movant to create a factual dispute, so long as they reasonably
> may be drawn from the facts.  When more than one inference reasonably can
> be drawn, it is for the trier of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one

inference from the facts, and if that inference introduces a genuine issue of material fact, then the

court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v.

Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact

is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-

moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry is

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

**IV.**   **Discussion**

 **A.**   **Motion to Strike**

This Court will first address the Plaintiffs' Motion to Strike Debra Edwards and Zita

Rekesius as Witnesses and to Strike Their Affidavits as the Court's ruling on this motion will

effect what exhibits it will consider in ruling on the parties' motions for summary judgment. Discovery cut-off in this case was January 31, 2005.  (Doc. No. 30, ¶4).  In their motion to strike, Plaintiffs contend that after the close of discovery Defendants[7] submitted two affidavits from individuals never previously disclosed to Plaintiffs, namely Debra Edwards ("Edwards") and Zita Rekesius ("Rekesius").  Blood and Balkwill respond that they supplemented their disclosures and disclosed the names/affidavits of witnesses Edwards and Rekesius once they determined these witnesses might be used against Plaintiffs' claims in accordance with Fed. R. Civ. P. 26(a)(1) and 26(e)(1).

Edwards' affidavit is dated February 2, 2005 and Plaintiffs received Edwards' affidavit on February 9, 2005, nine days after the close of discovery.  Edwards' affidavit pertains to an interview between Edwards, who is a paralegal in the Office of the County Attorney, Sarasota County, Florida, and Jesus Ramos with respect to the March 20, 2000 interview of Jesus Ramos by Blood.  Specifically, Edwards' affidavit attests that Jesus Ramos told her that he informed Blood that Henry Salem was living at 3026 Gillespie Avenue.  Rekesius' affidavit is dated March 10, 2005 and Plaintiffs received Rekesius' affidavit on March 10, 2005, thirty eight days after the close of discovery.  Rekesius' affidavit pertains to procedures used by the Sarasota County Sheriff's Office with regard to the receipt and processing of warrants.  Plaintiffs argue that Defendants' failure to timely disclose the existence of these individuals, and the information in their affidavits,  prejudices them and should be stricken.  This Court disagrees.

---

[7]The Court notes that these affidavits were submitted by Blood and Balkwill in support of their motion for summary judgment. (Doc. No. 72, Exh. E and M thereto).  The City of Sarasota, Gilbert and Jolly do not rely on the subject affidavits in support of their motion for summary judgment.  (Doc. No. 94, ¶1).

Plaintiffs cite to no case law to support their assertion that Balkwill and Blood are precluded from utilizing the subject witnesses and affidavits and do not establish how they are prejudiced by the late disclosures.  Balkwill and Blood offered to make Edwards available for deposition after the close of discovery and Plaintiffs declined.  Furthermore, Jesus Ramos was identified in initial disclosures on April 5, 2004 and could have been deposed by Plaintiffs at any time prior to the discovery cut-off date.  To the extent Plaintiffs argue that Edwards' affidavit contains hearsay and should be striken, this argument is not persuasive.  Specifically, Edwards' affidavit is not offered to prove that Henry Salem actually lived at the Subject Property.  Rather, it is offered merely to show that Jesus Ramos made the statement to Blood.  Where the significance of a statement lies solely in the fact that it was made, rather than the veracity of the out-of court declarant's assertion, the statement is not hearsay.  See F.D.I.C. v. Stahl, 89 F.3d 1510, 1521 (11th Cir. 1996)(citing United States v. Parry, 649 F.2d 292, 295 (5th Cir. 1981)); see also Story v. Sunshine Foliage World, Inc., 120 F. Supp. 2d 1027, 1030 - 31 (M.D. Fla. 2000).

Rekesius' affidavit attests that there was a procedure by which Blood could have ascertained the existence of the arrest warrant for Henry Salem even if it had not yet been entered into the Sarasota County Sheriff's Office computer.[8]  Rekesius' affidavit describes the warrant intake process which was previously disclosed to Plaintiffs in Balkwill's Response to Plaintiffs' Second Set of Interrogatories (Doc. No. 93, Exh. 6 thereto).  Specifically, Balkwill's Response to Plaintiffs' Second Set of Interrogatories states "the warrant could have been known

---

[8]The warrant was clocked in by the warrants division of Sarasota County Sheriff's Office on Marcy 17, 2004 at 10:34 a.m. and entered into the computer on March 21, 2000 at 10:09 a.m. (Doc. No. 101).

to and/or accessed by Sarasota County Sheriff's personnel at any time after it was received by

the Sheriff's Office on March 17 and further could have been known to and accessed by various

Sheriff's Office personnel or others as early as the date it was issued by the Court on March 10,

2000."  Plaintiffs admit that they did not seek to ascertain the identity of any witness regarding

the warrant intake process as "they were content with the admission that the warrant had not

been entered into the computer."  (Doc. No. 93).  Accordingly, Plaintiffs' Motion to Strike Debra

Edwards and Zita Rekesius as Witnesses and to Strike Their Affidavits is DENIED.  The Court

declines to award Balkwill and Blood attorney's fees under Fed. R. Civ. P. 37(a)(4) with respect

to this motion

> **B.**      **Plaintiffs' 42 U.S.C. §1983 Claims Against the Individual Defendants (Counts II, VII, VIII and IX)**

The Court will next address the motions for summary judgment as they relate to

Plaintiffs' federal claims.  Plaintiffs argue they are entitled to partial summary judgment because

Blood, Jolly and Gilbert had no legal authority to enter onto the Subject Property and invade

Plaintiffs' private protected areas at their residence (Doc. No. 89).  Blood, Jolly and Gilbert

contend that all of Plaintiffs' §1983 claims fail based upon the doctrine of qualified immunity.

Jolly and Gilbert argue that Plaintiffs have presented no evidence that they violated Plaintiffs'

established constitutional rights by knocking on the front door and proceeding around to the side

of the house in providing assistance to Blood.  Blood argues that Counts II and VII fail because

he had lawful authority to enter Plaintiffs' property, or in the alternative, that his entering onto

and viewing the exterior of Plaintiffs' residence does not implicate Plaintiffs' rights under the

Fourth Amendment, since they had no reasonable expectation of privacy there.

**Qualified Immunity**

"Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances."  Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). In other words, "[t]he standard of objective reasonableness which is used to assess an officer's entitlement to qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  Priester v. City of Riviera Beach, 208 F.3d 919, 925 (11th Cir. 2000)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Because of the important public policies underlying the defense of qualified immunity, "'courts should think long and hard before stripping defendants of immunity.'"  Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004)(quoting Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994)).

For qualified immunity to apply, the government official must first prove that he was acting within his discretionary authority.  See Cottone v. Jenne, 326 F.3d 1352, 1357-58 (11th Cir. 2003).  "A governmental official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority."  Grayden v. Rhodes, 345 F.3d 1225, 1231, n.12 (11th Cir. 2003)(quoting Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1885 n. 17 (1994)).  In this case, Plaintiffs do not dispute that Blood, Gilbert and Jolly were acting within their discretionary authority.  Thus, the burden shifts to Plaintiffs to show that Defendants Blood, Gilbert and Jolly are not entitled to qualified immunity.  See Id. at 1358.

The Supreme Court has outlined the following two-prong test for determining if an officer is entitled to qualified immunity: (1) taking all of the facts in the light most favorable to the plaintiff, do the facts demonstrate a violation of a constitutional right, and (2) if so, was that constitutional right "clearly established?"  See Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  For a constitutional right to be clearly established, a plaintiff must show that "'when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood that his acts were unlawful.'" Gold v. City of Miami, 121 F.3d 1442, 1445 (11th Cir.1997)(quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993)).

Importantly, in a case such as this one where Plaintiffs argue the officers lacked probable cause, for qualified immunity to be applicable an officer need only have arguable probable cause rather than actual probable cause to support his actions.  See Lee, 284 F. 3d at 1196.  "The standard for arguable probable cause is 'whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law.'" Gold, 121 F.3d at 1445 (quoting Eubanks v. Gerwen, 40 F.3d 1157, 1160 (11th Cir. 1994)).   With these principles in mind, the Court will examine the issues presented in this case.

### 1.      Defendants', Blood, Gilbert and Jolly, Conspiracy to Illegally Search and Illegal Search (Counts II and VII)

Blood, Gilbert and Jolly all contend that probable cause existed for them to approach the Subject Property.  Probable cause is a "'practical nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Maryland v. Pringle, 540 U.S. 366, 370 (2003)(quoting Illinois v. Gates,

14

462 U.S. 213, 231 (1983));see also Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990).

Blood went to the Subject Property while investigating a criminal complaint.  He had

information obtained from Jesus Ramos, the victim of an assault and battery, that the perpetrator

of that crime lived at that address.  Generally, an officer is entitled to rely on a  victim's

statement or criminal complaint as support for probable cause.  See Rankin v. Evans, 133 F.3d

1425, 1441 (11th Cir. 1998); see also Marx, 905 F.2d at 1507.  Therefore, Blood had arguable, if

not actual probable cause, to approach the Subject Property.  Blood, Gilbert and Jolly limited

their entry on the Subject Property to knocking on the front door and walking into

north/northeast side yard.

 In acting as backup to Blood, Gilbert and Jolly justifiably relied on Blood's

determination of probable cause to approach the Subject Property under the "fellow officer rule."

The "fellow officer rule" imputes the collective knowledge of police investigating a crime to

each member, and each officer need not have independent personal knowledge.  See State v.

Peterson, 739 So. 2d 561, 565 (Fla. 1999); see also Alderman v. McDermott, 2004 WL 1109541,

at *6, n. 93 (M.D. Fla. 2004).  The "fellow officer rule" applies to searches as well as arrests.

See Peterson, 739 So. 2d at 567; see also United States v. Wilson, 894 F.2d 1245, 1254 (11th

Cir. 1990).

 Blood, Gilbert and Jolly did not conduct an illegal search at the Subject Property.

"Under the fourth amendment no governmental 'search' occurs if the place or object examined is

publically exposed such that no person can reasonably have an expectation of privacy."  United

States v. Eubanks, 876 F.2d 1514, 1516 (11th Cir. 1989); see also Illinois v. Andreas, 463 U.S.

765, 771 (1983).  In determining whether a person has a reasonable expectation of privacy in the

yards adjacent to their homes[9], a court looks to the following four factors: (1) the proximity of

the area to the home; (2) whether the area is included within an enclosure surrounding the home;

(3) the nature of uses to which the area is put; and (4) the steps taken to protect this area from

outside observation.  See United States v. Dunn, 480 U.S. 294, 301 (1987); see also United

States v. Hatch, 931 F.2d 1478, 1479 (11th Cir. 1991).

The evidence in the record establishes that Blood, Gilbert and Jolly did not have to open

any gate to approach the front door of the Subject Property.  Gilbert never proceeded onto the

Subject Property other than to knock on the front door.  A person does not have a reasonable

expectation of privacy at their front door or front porch.  See State v. Morsman, 394 So. 2d 408,

409 (Fla. 1981).  Jolly and Blood entered into the north side yard of the Subject Property;

however, applying the four factors listed above, it is clear that the officers did not conduct an

illegal search.

While the north side yard is in close proximity to the house, it was not fully enclosed by

the chain link fence.  That is, once the officers were at the front door of the Subject Property they

did not have to open a gate to subsequently enter the side yard.  The chain link fence did not

restrict visibility into the side yard, and therefore, does not define the side yard as curtilage.  See

United States v. Williams, 581 F.2d 451, 454 (5th Cir. 1978).[10]  Plaintiffs did not utilize their

side yard for private activities, and they were not concerned about observation by the public.

---

[9]Areas found to harbor a reasonable expectation of privacy are referred to as "curtilage" and are entitled to Fourth Amendment protection from unreasonable searches. See Dunn, 408 U.S. at 300.

[10]Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

See <u>Dunn</u>, 480 U.S. at 300.  Furthermore, Plaintiffs took no steps to protect this area from observation.  Plaintiffs concede that a person standing in the street could observe the entire side yard, back to the back fence.  Furthermore, even the backyard was visible from adjacent properties.  Plaintiffs could not have had a reasonable expectation of privacy in their side yard when it was knowingly exposed to the public.  <u>See</u> <u>Katz v. United States,</u> 389 U.S. 347, 351 (1967).   Accordingly, Plaintiffs have failed to demonstrate that Blood, Jolly and Gilbert's actions constituted a search in violation of their Fourth Amendment Rights.  Accordingly, Blood, Jolly and Gilbert are entitled to qualified immunity on Counts II and VII.

### 2.  Defendant Jolly's Use of Excessive Force (Count VIII)

Plaintiffs allege that Jolly used excessive force while conducting an illegal search of the Plaintiffs' property by spraying Cap-Stun onto and into the Plaintiffs' residence when there was no imminent threat to Jolly's personal safety (Doc. No. 59, ¶119).  When analyzing a claim for excessive force under § 1983, the Court must first identify the specific constitutional right infringed by the application of force.  <u>See</u> <u>Graham v. Conner</u>, 490 U.S. 386, 394 (1989).  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  <u>See</u> <u>Saucier</u>, 533 U.S. at 202.

The Eleventh Circuit has noted that with Fourth Amendment excessive force claims, there is no bright line test for determining when force is so excessive that a clearly established constitutional right has been violated.  <u>See</u> <u>Priester</u>, 208 F.3d at 926 (citation omitted).  Rather, "[t]he question is whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation." <u>Montoute v. Carr</u>, 114 F.3d 181, 183 (11th Cir. 1997)(citing <u>Graham</u>, 490 U.S. at 397)).  Construing the facts

17

in the light most favorable to Plaintiffs, this Court must determine whether the state of the law at the time of the incident gave Jolly fair warning that the spraying of Cap-Stun under those circumstances was unconstitutional.  See Hope v. Pelzer, 536 U.S. 730, 741 (2002).  The only use of Cap-Stun clearly established by the facts was Jolly's spraying an aggressive dog in the side yard of the home.[11]  Plaintiffs have failed to establish Jolly's actions were excessive or violated their clearly established constitutional rights.  Accordingly, Jolly is entitled to qualified immunity on Count VIII.

### 3.     Defendant Blood's Failure to Intercede to Protect Plaintiffs' Constitutional Rights (Count IX)

Law enforcement officers may be held liable under §1983 for failing or refusing to intervene when another officer uses excessive force.  See Priester, 208 F.3d at 924; see also Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998).  This claim against Blood, however, presupposes that Jolly did in fact use excessive force.  As stated above, Plaintiffs have failed to establish that Jolly's actions constituted excessive force.  Therefore, Plaintiffs' claim that Blood failed to protect them from unconstitutional harm fails.  Accordingly, Blood  is entitled to qualified immunity on Count IX.

### C.     Pendent State Claims (Counts I, V, VI, VIII [sic] and X)

Having disposed of Plaintiffs' federal claims, this Court declines to exercise supplemental jurisdiction over Plaintiffs' five remaining pendent state law claims, pursuant to 28 U.S.C. § 1367(c)(3). See, e.g., United Mine Workers of America v. Gibbs, 383 U.S. 715, 727

---

[11]To the extent that Plaintiffs base their use of excessive force claim on Jolly's spraying of the dog, the Court finds that Jolly had probable cause to approach the Subject Property and his actions were objectively reasonable in light of the facts confronting him.

(1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.); see also Carnegie-Mellon University v. Cohill, 484 U.S. 343, 349-50 (1988) (reaffirming authority of district courts to refuse to hear pendent state claims when the federal claim has been disposed of prior to trial).

**IV.   Conclusion**

The Court finds that Plaintiffs have not, as a matter of law, satisfied their burden of overcoming the qualified immunity protection accorded Blood, Gilbert and Jolly in the case. Therefore, it is **ORDERED AND ADJUDGED** that:

1       Defendants', City of Sarasota,  Michael Jolly ("Jolly") and Derrick Gilbert ("Gilbert"), Motion for Final Summary Judgment (Doc. No. 66) is **GRANTED** to the extent that the Court finds Jolly and Gilbert enjoy qualified immunity.

2.      Defendants', William Blood ("Blood") and Sarasota County Sheriff William F. Balkwill ("Balkwill"), Motion for Summary Judgment (Doc. No. 72) is **GRANTED** to the extent that the Court finds Blood enjoys qualified immunity.

3.      Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 89) is **DENIED**.

4.      Plaintiffs' Motion to Strike Debra Edwards and Zita Rekesius as Witnesses and to Strike Their Affidavits (Doc. No. 93) is **DENIED**.

5.      The Court declines to exercise supplemental jurisdiction over Plaintiffs' pendent state claims pursuant to 28 U.S.C. § 1367(c)(3) and they are **DISMISSED WITHOUT PREJUDICE**.

6.      The Pretrial Conference in the above-captioned matter which was previously scheduled for Wednesday, July 13, 2005, at 8:30 a.m. is hereby cancelled.

7.      The parties' Joint Motion for Extension of Time (Doc. No. 111) is **DENIED AS**

        **MOOT**.

8.      The Clerk is directed to do the following: **ENTER JUDGMENT** for Defendants

        Blood, Gilbert, and Jolly on Counts II and VII, for Defendant Jolly on Count VIII,

        and for Defendant Blood on Count IX; **CLOSE** the case; and **TERMINATE** all

        pending motions.

**DONE AND ORDERED** at Tampa, Florida, this 30th day of June, 2005.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record